IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-03485-MEH

BRANDON WILSON,

     Plaintiff,

v.

ANDREW SAUL, Commissioner of Social Security,

     Defendant.

_____

## ORDER
_____

**Michael E. Hegarty, United States Magistrate Judge**.

Plaintiff Brandon Wilson appeals from the Social Security Administration ("SSA") Commissioner's final decision denying his application for disability and disability insurance benefits ("DIB"), filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401–433 and his application for supplemental security income benefits ("SSI"), filed pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–83c. Jurisdiction is proper under 42 U.S.C. § 405(g). The parties have not requested oral argument, and it would not materially assist the Court in its determination of the appeal. After consideration of the parties' briefs and the administrative record, the Court affirms the Administrative Law Judge's ("ALJ") decision.

## BACKGROUND

### I.    Procedural History

Plaintiff seeks judicial review of the Commissioner's decision denying his applications for DIB and SSI filed on September 6, 2016. Administrative Record ("AR") 16. After the DIB application was denied on February 7, 2017 (AR 62–63), the ALJ scheduled a hearing on

Plaintiff's request for October 23, 2018 (AR 35), at which Plaintiff was represented by counsel, and Plaintiff and a vocational expert testified. AR 35–61. The ALJ issued a written ruling on January 30, 2019 finding Plaintiff was not disabled starting on March 31, 2015 because, considering Plaintiff's age, education, work experience, and residual functional capacity, Plaintiff was capable of making a successful adjustment to other work that existed in significant numbers in the national economy. AR 16–28. On October 11, 2019, the SSA Appeals Council denied Plaintiff's administrative request for review of the ALJ's determination, making the SSA Commissioner's denial final for the purpose of judicial review. AR 1–3. *See* 20 C.F.R. § 404.981. Plaintiff timely filed his Complaint and Petition for Review with this Court on December 10, 2019. ECF 1.

## II.    **Plaintiff's Alleged Conditions**

Plaintiff was born on July 9, 1992; he filed his applications for DIB and SSI on September 6, 2016. AR 62–63. Plaintiff claims he became disabled on March 31, 2015 and reported that he was limited in his ability to work due to asthma, ITB muscle disorder in his hip, bipolar disorder, schizophrenia, anxiety, lower back injury, and obesity. AR 104. No party disputes that Plaintiff's "date last insured" for purposes of social security benefits was December 31, 2016; thus, the Plaintiff must establish a "disability" on or before that date to be entitled to a period of DIB and SSI. In describing Plaintiff's medical history, the Court will focus primarily on those records cited by the parties and the ALJ in this case.

In March 2015, Plaintiff's treatment notes show a history of mental health treatment for bipolar disorder, schizophrenia, and anxiety disorders. They also show that Plaintiff was discharged from treatment for "minimal progress due to lack of engagement in treatment recommendations." AR 292. The notes indicate that Plaintiff had "not responded to phone or mail

outreach[,] . . . ha[d] not attended a med appointment in 11 months[,] . . . [and] ha[d] not attended DBT or Individual therapy since Nov. 2014." AR 293. Other records at this time demonstrate that Plaintiff received treatment via Botox injections for his migraines, with reports that Plaintiff was "doing well." AR 700.

In April 2015, Plaintiff indicated that he had numbness and tingling in his right hand and wrist. AR 705–08. He underwent nerve conduction studies, and the findings were normal. *Id.* In July and October 2015, Plaintiff received additional Botox injections, and a neurologist noted that he appeared to be doing well, looking well, and reporting no new symptoms. AR 709–16. In December 2015, Plaintiff reported a slip and fall in which he hit his head. AR 412–29. He received treatment at an emergency room; examination notes suggest no paresthesia, that Plaintiff was able to use his hands and feet, no tenderness in Plaintiff's head, normal musculoskeletal range of motion, and a non-tender back. *Id.* While in the emergency room, Plaintiff discussed his history of bipolar disorder and some increase in irritability since hitting his head. *Id.* Plaintiff reported that he was not taking any medications. *Id.*

In March 2016, Plaintiff received additional Botox injections to help treat his migraines. AR 721–32. Plaintiff continued to do well with no new reports of additional symptoms. *Id.* In August 2016, following reports of suicidal ideation, Plaintiff was admitted to the emergency room and placed on a seventy-two-hour mental health hold. AR 283–84, 313, 349–50, 594. Plaintiff stated that he planned to cut himself because of issues in his polyamorous relationship. AR 283–84. The treatment notes indicate that Plaintiff had not been on his medications for the past seven months. AR 283–84, 303, 349–50. An examination concerning Plaintiff's mental status revealed that he was alert and oriented "x4," exhibited tense behavior and poor insight and judgment, and had audio and visual hallucinations. AR 283–84. However, Plaintiff's concentration and memory

were noted to be within normal limits.  *Id.*  After the evaluation, the treating physicians provided

medication and discharged Plaintiff from the emergency room.  AR 292–93.

Plaintiff returned to the emergency room following helping a friend move a tree.  AR 278,

349, 376, 721.  The treatment notes demonstrate that Plaintiff exhibited a non-tender back, normal

range of motion, normal coordination, normal strength, and no focal neurological deficits.  AR

345–61.  Imaging studies were conducted, showing moderate disc space narrowing at L5-S1.  AR

392, 613, 696.

Later in August 2016, Plaintiff was referred for a physical therapy evaluation.  AR 582–

93.  Plaintiff was noted to be well developed with obesity issues, have some nerve root irritations

after lifting something, and exhibit tightness in his hip rotators.  *Id.*  A program of progressive

strengthening and stretching together with soft tissue work, functional dry needling, and modalities

was advised.  *Id.*  Treatment notes show that Plaintiff only completed one physical therapy session.

AR 684–95.

Around September 2016, treatment records began to note that Plaintiff initiated individual

therapy sessions.  AR 340.  Around October 2016, Plaintiff also had a medication management

intake appointment, at which his medications were adjusted to treat his depression and negative

thoughts.  AR 320–21.  In a follow-up appointment, treatment notes show that Plaintiff had fair

grooming and dress, was calm, cooperative, alert and oriented, and reported improvements in his

mood and anxiety.  *Id.*  Plaintiff also stated that he had a reduction in hallucinations since starting

medication.  *Id.*

In November 2016, Plaintiff contended that he had minimal issues in caring for his own

personal care needs, including that he was able to prepare his daily meals.  AR 229–36.  Further,

Plaintiff could accomplish his household chores (like doing the laundry and cleaning), was able to

drive, and could go out every day.  *Id.*  Plaintiff had the ability to go out alone, could shop in stores on a monthly basis, could manage his financial affairs, and had hobbies.  *Id.*  Also, Plaintiff could spend time with other individuals at church and while playing cards.  *Id.*  Finally, Plaintiff asserted that he could get in and out of bed, dress, and bathe himself.  *Id.*; AR 684–95.

In December 2016, Plaintiff reported that four sessions of chiropractic care improved his back pain.  AR 684–95.  Other than that, treatment notes show that Plaintiff was "not currently receiving any medical care" for his back.  *Id.*  Plaintiff also indicated that he participated in psychotherapy on a weekly or biweekly basis and found those sessions to be helpful.  *Id.*  Testing of his mental status found Plaintiff to be pleasant, cooperative, and without acute distress.  *Id.*  He was noted to have sufficient attention and concentration and average memory for repeating three objects and four digits forward and backward.  Additionally, abstraction testing showed Plaintiff had an average ability to think abstractly and to choose appropriate actions in simple social scenarios.  *Id.*  In all, the findings did not suggest significant neurocognitive limitations.  *Id.*

Additionally, Plaintiff was evaluated by Kerry Kramer, D.O., for a Consultative Examination.  AR 689–95.  Dr. Kramer noted that Plaintiff weighed 353 pounds, had a pleasant demeanor, appeared in no acute distress, appeared to sit comfortably during the exam, and arose spontaneously and unaided from a seated position without discernible discomfort.  *Id.*  Further, Dr. Kramer recorded that Plaintiff did not appear anxious, agitated, or drowsy and responded appropriately with sufficient effort throughout the exam. *Id.*  Specifically, Dr. Kramer found that Plaintiff exhibited 5/5 strength in his bilateral upper and lower extremities, 5/5 grip strength, no focal muscle weakness or motor loss, and no focal neurological deficits.  *Id.*  As to functional limitations, Dr. Kramer opined that Plaintiff had no limitations in sitting, standing, or walking, the ability to lift/carry twenty-five pounds frequently and fifty pounds occasionally, no recommended

limitations with bending, stooping, squatting, crouching, or crawling, and no visual, communicative, or other workplace environmental limitations.  *Id.*  Finally, Dr. Kramer diagnosed Plaintiff with a history of left leg and lower back injuries, asthma, depression, anxiety disorder, bipolar disorder, and schizophrenia.  *Id.*

In January 2017, Plaintiff again saw his neurologist, reporting tension and pounding headaches.  AR 721–24.  Treatment notes state that imaging studies of Plaintiff's brain had been unremarkable, and that Plaintiff had not had Botox injections in about a year.  *Id.*  In February 2017, following complaints of chronic lumbar pain and left hip pain, Plaintiff had additional imaging studies done which showed no acute osseous abnormality and no significant degenerative change in his hip.  AR 698–99.

Also in February 2017, State Agency medical consultant, Virginia Thommen, M.D. conducted a review of Plaintiff's records.  AR 64–97.  Dr. Thommen's opinions included that prior to August 19, 2016, Plaintiff had no severe physical impairments.  AR 70–72.  After then, Plaintiff had limitations, including being able to lift/carry ten pounds frequently and twenty pounds occasionally, frequently climbing ramps and stairs, occasionally climbing ladders, ropes, and scaffolds, and having an unlimited ability to balance.  *Id.*

In March 2017, Plaintiff's mental health treatment records indicate that he changed to an "as needed basis" with his therapist beginning roughly five months prior.  AR 754–55.  Plaintiff had another medication management appointment at which he was advised to continue therapy and psychotropic medications were adjusted.  *Id.*  In April 2017, treatment notes demonstrate that Plaintiff's "mental illness and depression are stable."  AR 755–56.  Later, Plaintiff asserted that he had an increase in stress from a "complicated relationship" and living on his own for the first time.  AR 756–57.  Plaintiff admitted that he had not set any new therapy sessions.  AR 757.

Plaintiff reported that he continued to suffer from cluster headaches and migraines.  AR 701.  Treatment notes at the time state that Plaintiff was advised to increase the dosage of his medication.  AR 727.  On physical examination, Plaintiff was assessed as having 5/5 strength, no dysmetria, and a tandem walk without abnormality.  By August 2017, Plaintiff asserted that his headaches had decreased with the use of medication.  AR 729–30.

Plaintiff resumed therapy and found it to be helpful in that his "mood [was] much better after therapy compared to before therapy."  AR 758.  Yet, in August, Plaintiff reported that he "does not need or desire regularly scheduled therapy contacts and would like to be seen on an as needed basis to help maintain stability."  AR 747.  The notes from a September therapy session demonstrate that Plaintiff stated there was no major psychological changes in his life but maintained that he had some financial stress related to his car and car insurance.  AR 750.  Plaintiff also reported that he benefited from the use of his psychotropic medications.  *Id.*  At this point, the record does not reveal further mental health treatment for the next three months.

In January 2018, Plaintiff resumed mental health treatment, reporting that he was "not doing good" with his depression and hallucinations.  AR 763.  Plaintiff stated that he was no longer taking his psychotropic medications.  *Id.*  On resuming treatment, Plaintiff again took his medications.  AR 764–65.  In February 2018, Plaintiff felt "more emotional and temperamental" but stopped taking the Latuda medication.  AR 732.  By March 2018, Plaintiff had resumed taking Latuda which improved his hallucinations but did not affect his depression or irritability.  AR 764.  At a follow-up appointment, Plaintiff's medication dosages were increased, and he was advised to continue therapy.  *Id.*  In an April 2018 follow-up session, Plaintiff contended that he saw improvement in his mood other than that he would still get irritated easily.  AR 765.  At that

appointment, his medications again were adjusted.  *Id.*  The record shows that Plaintiff did not appear for his May 2018 follow-up appointment.  AR 766.

In June 2018, Plaintiff resumed taking his Latuda but stopped taking the medication Gabapentin.  AR 767.  Plaintiff's next mental health appointment was in October 2018, at which treatment notes indicate Plaintiff had good compliance with recommendations, no side effects, and an increase in symptoms due to his upcoming disability hearing and his girlfriend's health issues.  AR 791.

## III.    Hearing Testimony

At the hearing on October 23, 2018, Plaintiff (who appeared with counsel) and a vocational expert ("VE"), John Hurst, testified.  AR 33–61.  After confirming with Plaintiff's counsel that there were no objections to the exhibits (AR 35–36), the ALJ proceeded to question Plaintiff, who testified that around March 31, 2015, his schizophrenia began to escalate and that he damaged his back.  AR 37.  The ALJ also asked Plaintiff what the reason was for him having worked some short-term jobs.  AR 39.  Plaintiff responded that he would get to his job and "either [his] various anxieties, the voice [he] hear[s], or [his] physical state would not allow him to continue" working.  *Id*.  Plaintiff testified that the physical symptoms that he had that prevented him from working were extreme back pain, extreme hip pain, and constant shaking of his hands.  *Id*.  Subsequent questions from the ALJ revealed that Plaintiff had worked as a delivery driver and as a customer care line operator.  AR 39–41.  Following that discussion, Plaintiff indicated that he was seeing a new doctor for therapy who had prescribed him additional medications.  AR 41.  The ALJ and Plaintiff also engaged in a conversation regarding Plaintiff's migraines (and the medications and Botox used to treat them) and hallucinations (and medications to treat those).  AR 42–43.

In response to his attorney's questions, Plaintiff testified about his daily auditory hallucinations including a lot of whispering that increases in volume, with the subject matter being self-deprecating or asking him to do things he refused to do; his near-daily visual hallucinations, including seeing "eyes in every corner" and "every shadow," "things crawling out of every corner" and shadows that moved; his textile hallucinations, including feeling hands on his arms, legs, and feet; his experience with anger and stress problems; his hard time with authority figures, including losing jobs for not being able to get along with supervisors or coworkers; his problems with maintaining a schedule and changes to a routine; his migraines that occur two to three times a week and are triggered by stress; his "extreme amount of paranoia;" his "stabbing" back pain that also affects his hips which causes him to need to stand up, move around, or walk after thirty minutes of sitting; his use of a cane to assist in walking; his ability to carry thirty pounds at most for short periods of time; his shoulder surgery affecting the ability to move his right arm; his shaking in the hands that makes it hard to "do most things that require fine motor skills;" his weekly asthma problems caused by exertion, extreme heat, and stress; his use of an inhaler for his asthma; his problems with a sleep schedule caused by constant nightmares; and his issues with upset stomach and rarely having a "solid bowel movement."  AR 46–53.

The ALJ proceeded to ask Plaintiff questions, to which Plaintiff responded that he had an "okay" time entering the courthouse but was "shaking with the anxiety;" he took his medication the morning of the hearing; he stopped going to church several years after he moved out and lost contact with anyone from the church; he had a friend that lived in the same apartment complex as him and occasionally came over to visit; his cane was not prescribed by a doctor but was a gift; and he stopped wanting regular mental health sessions beginning in at least August 2017 from stress.  AR 53–55.

The ALJ then turned to the VE, Mr. Hurst,[1] who had listened to Plaintiff's testimony and testified that an individual with Plaintiff's age, experience and education and the following limitations —

> [L]ift 50 pounds occasionally, but on a more frequent basis 25 pounds. Stand, walk and sit could all be performed six hours in an eight hour workday with normally allotted work breaks. The individual is able to climb ramps and stairs on a frequent basis . . . [with] no more than occasional climbing of ladders, ropes or scaffolds. Balancing is unlimited. Stooping can be performed occasionally; kneel, crouch and crawl also occasionally. The individual should avoid work in extremes of cold. The person should not work with fast moving machinery more than occasionally. Mental limitations would involve ability to interact appropriately on a brief and occasional basis with coworkers and supervisors. This individual should not be asked to work on a team or to work closely with coworkers. They would do best if they had tasks not requiring public interaction. The individual should not be assigned work that would be under a production quota. However, they are able to perform goal oriented work and sustain a routine and maintain attendance.

— could perform the jobs of "medical assembler, plastics," "laundry folder," and "laundry worker II." AR 56–57.

The ALJ altered the hypothetical to include: reducing "the individual to performing light work in this manner, lift 20 pounds occasionally, ten pounds on a frequent basis; stand, walk, sit six hours each in an eight hour workday with normally allotted work breaks; frequent ability to stoop. I would indicate no work on ladders, ropes or scaffolds with fast moving machinery or at unprotected heights." Mr. Hurst testified that an individual with those limitations could perform the same two light jobs as before and "solderer, production line." AR 57–58. If the limitations were further restricted such that the individual could perform the full range of sedentary work, lift ten pounds occasionally, lift ten pounds on a frequent basis; stand and walk could be done two hours in an eight hour workday, sitting would be six hours in an eight hour workday with normally allotted work breaks," jobs that would be available are "clerical addressor," "touch-up screener for

---

[1]Plaintiff did not object to the VE's qualifications to testify. AR 55.

the circuit board industry," and "semiconductor bonder."  AR 58–59.  If the limitations were further restricted to having "unexpected off task behavior regarding disagreements with coworkers or supervisors or hallucinations, [occurring] approximately 25 percent of the workday, [that] could also be as a result of migraine headache taking them off task 25 percent," all full-time, sustained employment would be eliminated.  AR 59.  To conclude the hearing, Plaintiff's counsel was offered the opportunity to ask the VE questions but declined.  AR 60.

The ALJ issued an unfavorable decision on January 30, 2019.  AR 16–28.

## LEGAL STANDARDS

To qualify for benefits under Sections 216(i) and 223 of the Social Security Act, an individual must meet the insured status requirements of these sections, be under age 65, file an application for DIB and/or SSI for a period of disability, and be "disabled" as defined by the SSA. 42 U.S.C. §§ 416(i), 423, 1382.

## I.     SSA's Five-Step Process for Determining Disability

Here, the Court will review the ALJ's application of the five-step sequential evaluation process used to determine whether an adult claimant is "disabled" under Title II and Title XVI of the Social Security Act, which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382(c)(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

Step one determines whether the claimant is presently engaged in substantial gainful activity.  If he is, disability benefits are denied.  *See* 20 C.F.R. §§ 404.1520, 416.920.  Step two is a determination of whether the claimant has a medically severe impairment or combination of

impairments as governed by 20 C.F.R. §§ 404.1520(c), 416.920(c).  If the claimant is unable to show his impairment(s) would have more than a minimal effect on his ability to do basic work activities, he is not eligible for disability benefits.  *See* 20 C.F.R. 404.1520(c).  Step three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment.  *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).  If the impairment is not listed, he is not presumed to be conclusively disabled.  Step four then requires Plaintiff to show his impairment(s) and assessed residual functional capacity ("RFC") prevent him from performing work he has performed in the past.  If the claimant is able to perform his previous work, the claimant is not disabled.  *See* 20 C.F.R. §§ 404.1520(e), (f), 416.920(e) & (f).  Finally, if the claimant establishes a prima facie case of disability based on the four steps as discussed, the analysis proceeds to step five where the SSA Commissioner has the burden to demonstrate the claimant has the RFC to perform other work in the national economy in view of his age, education and work experience.  *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

## II.     Standard of Review

The Court's review is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied.  *See Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *see also White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001).  Thus, the function of the Court's review is "to determine whether the findings of fact . . . are based upon substantial evidence and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970); *see also Bradley v. Califano*, 573 F.2d 28, 31 (10th Cir. 1978).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. . . . However, [a] decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citations omitted). In addition, reversal may be appropriate when the ALJ either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards. *Id.* (citing *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996)). But, in all cases, the Court may not re-weigh the evidence nor substitute its judgment for that of the ALJ. *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (citing *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)).

## ALJ's RULING

The ALJ ruled that Plaintiff did not engage in substantial gainful activity since March 31, 2015 (step one). AR 18. Further, the ALJ determined that Plaintiff had the following severe impairments: degenerative disc disease; obesity; bipolar disorder; schizophrenia; and anxiety (step two). AR 18. She found Plaintiff's other medically determinable impairments, namely migraines and asthma, were "non-severe." AR 18–19. Next, the ALJ found Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment deemed to be so severe as to preclude substantial gainful employment (step three). AR 19–20.

The ALJ then determined that Plaintiff had the residual functional capacity ("RFC")

to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can lift 20 pounds occasionally and 10 pounds frequently, stand/walk/sit for 6 hours each in an 8 hour workday with normally allotted work breaks. The claimant can frequently stoop, can never work on ladders, ropes, and scaffolds, with fast moving machinery, or at unprotected heights. The claimant can frequently climb ramps and stairs, has unlimited ability to balance, can occasionally kneel, crouch, and crawl. The claimant should avoid work in extremes of cold. The claimant can interact appropriately on a brief and occasional basis with coworkers or supervisors. The claimant should not be asked to work on a team or work closely with coworkers. The claimant does best with tasks not requiring public interaction.

> The claimant should not be assigned work under a production quota, but is able to perform goal oriented work, sustain a routine, and maintain attendance.

AR 20–21.  The ALJ found that Plaintiff has no past relevant work experience (step four), but, based on the RFC, the ALJ found that there were jobs in the national economy that Plaintiff could perform, such as "laundry folder," "medical assembler," and  "solder."  AR 27–28.  As a result, the ALJ concluded that Plaintiff was not disabled at step five of the sequential process and, therefore, was not under a disability as defined by the SSA.  AR 28.

## ISSUES ON APPEAL

Plaintiff seeks relief in the form of a finding "that Plaintiff is entitled to disability benefits" or remanding "the case for further hearing."  ECF 16 at 12.  On appeal, the Court is authorized solely to review whether the ALJ's decision is supported by substantial evidence in the record as a whole and whether the ALJ applied the correct legal standards.  *Williamson*, 350 F.3d at 1098; *White*, 287 F.3d at 905.  As described in Plaintiff's opening brief, he alleges the following errors: (1) whether the ALJ ignored two severe impairments at step two in her step three conclusion; (2) whether the ALJ failed to consider all of Plaintiff's medically determinable impairments at step four; and (3)whether the ALJ properly assessed Plaintiff's subjective allegations.

## ANALYSIS

### I.     ALJ Properly Considered Severe Impairments at Step Three

Plaintiff argues that the ALJ "failed to assess [his] severe impairments of degenerative disc disease and schizophrenia."  Op. Brief at 4.  In so arguing, Plaintiff notes that the ALJ's step three analysis "is limited to a discussion of Listings 12.04 and 12.06[,]" but "[s]chizophrenia is listed under 12.03 and Degenerative Disc Disease is listed under 1.04."  *Id.* at 5.  Defendant responds that Plaintiff bears the burden of proof (citing 20 C.F.R. § 404.1512(a)) and fails to provide evidence to demonstrate that he met Listing 1.04.  Resp. Brief at 7.  As to Listing 12.03, Defendant

argues that "the ALJ made findings in relation to Listings 12.04 and 12.06 that also demonstrate Plaintiff's schizophrenia was not a listing-level severity." *Id.*

"At step three, the ALJ determines whether the claimant's impairment is equivalent to one of a number of listed impairments that the Secretary acknowledges as so severe as to preclude substantial gainful activity." *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996) (internal quotation marks omitted). Plaintiff's argument includes that the ALJ did not mention the correct listings. Op. Brief at 5. Defendant does not dispute this. The question is whether such omissions constitute error worthy of remand.

Under Listing 12.03, a claimant must show medical documentation of certain symptoms such as delusions or hallucinations and either: "[e]xtreme limitation of one, or marked limitation of two," out of four areas of mental functioning ("B Criteria") or "a medically documented history of the existence of the disorder over a period of at least 2 years," with evidence of both medical treatment, mental health therapy, or psychosocial support and "minimal capacity to adapt to changes in [the] environment" ("C Criteria"). Listings 12.04 and 12.06 contain the same B and C Criteria as 12.03.

The ALJ specifically considered the B and C Criteria. AR 19–20. As to the B Criteria, the ALJ found that the record showed that "claimant was routinely noted to be oriented x3 with average memory and fund of information." AR 19–20 (citing Exh. 1F, 4F). From that, the ALJ concluded that Plaintiff has no limitation in understanding, remembering, or applying information. Likewise, the ALJ found that Plaintiff had no limitation in concentration, persisting, or maintaining pace, citing that "claimant was noted to exhibit no deficits with attention and concentration during mental status testing." AR 20 (citing Exh. 1F, 2F, 4F). The ALJ did find that Plaintiff had moderate limitation in interacting with others based on the conflicting evidence in the record. The

conflict stemmed from Plaintiff's testimony at the hearing that he only had one friend, but the record showed that he "was also noted to have the ability to spend time with others at church and while playing cards."  AR 20 (citing Exh. 3E, 4F).  Finally, the ALJ concluded that Plaintiff had mild limitation in adapting or managing himself based on evidence in the record showing that Plaintiff "relayed minimal issues caring for his own personal needs" but also that Plaintiff testified that "he required the assistance of a friend when shopping."  AR 20 (citing Exh. 3E).  From this, the ALJ found that the B Criteria was not met since it required two "marked" limitations or one "extreme" limitation.  AR 20.  With regard to the C Criteria, the ALJ considered whether the elements were satisfied, but found that the evidence failed to establish the requirements.  AR 20.

In *Clifton*, the Tenth Circuit found that the ALJ had erred because he "did not discuss the evidence or his reasons for determining that appellant was not disabled at step three, or even identify the relevant Listing or Listings."  79 F.3d at 1009.   Plaintiff argues that the ALJ in this case has made the same error.  The Court disagrees.  While the ALJ's analysis of the C Criteria is lacking some explanation, the discussion of the B Criteria is not.  The ALJ thoroughly described the B Criteria elements and explained what evidence in the record supported (or did not support) each element.  The ALJ states that she considered the entire record, but there is no need for the ALJ to recite every piece of evidence.  *Id.* at 1009–10 ("The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.").  Therefore, the Court finds that any error the ALJ committed in omitting a specific discussion of Listing 12.03 is harmless since the ALJ properly considered and discussed the evidence for Listings 12.04 and 12.06 which share the same B and C Criteria with 12.03.

Confirming the harmless nature of the error is Plaintiff's lack of citation to evidence in the record supporting the requirements of Listing 12.03.  Plaintiff states that the "error caused harm to

[him] as the medical evidence clearly supports a finding that he meets, equal or exceeds the criteria for 12.03." Op. Brief at 6. Regardless of the fact that the ALJ's analysis showed that Plaintiff did not meet the B Criteria elements, Plaintiff does not direct the Court to any evidence to support his view that he met the listing requirements. Consequently, as a matter of law, Plaintiff cannot show that he satisfied Listing 12.03. *See Duncan v. Colvin*, 608 F. App'x 566, 576 (10th Cir. 2015) ("Because [the plaintiff] has not satisfied all of the Listing's criteria, she cannot prevail at step three as a matter of law."); *Aslan v. Colvin*, 637 F. App'x 509, 509 (10th Cir. 2016) (finding that the plaintiff cannot prevail as a matter of law because he failed "to direct [the court's] attention to any medical records confirming he suffers from" the requirements of the listing).

As to Listing 1.04, a claimant must provide evidence of "nerve root compression characterized by neuro-anatomic distribution of pain," ("1.04A"), or "[s]pinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy," ("1.04B"), or "[l]umbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging," ("1.04C"). The parties do not (and cannot) dispute that unlike with 12.03 in which the ALJ discussed similar listings, the ALJ completely omitted any discussion of 1.04 or related listings. Plaintiff argues that this error warrants remand. The Court disagrees.

The Court finds *Duncan v. Colvin* instructive. In that case, like here, the plaintiff argued that the ALJ committed reversible error (citing *Clifton*) in not addressing or evaluating Listing 1.04A in his step three analysis. 608 F. App'x at 575. The Tenth Circuit held that even if the ALJ had erred in not discussing 1.04A in his step three analysis, the error was harmless "in light of the ALJ's findings at subsequent steps of the disability analysis." *Id.* at 576 (citing *Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005)). The court noted that Listing 1.04A required "nerve root compressing resulting in limited range of motion and motor loss with muscle weakness." *Id.*

In the RFC analysis, the ALJ found that the plaintiff could occasionally lift and/or carry ten pounds, "occasionally climb stairs, balance, bend or stoop, kneel, crouch, and crawl." *Id.* Though not in the step three analysis, the Tenth Circuit ruled that this RFC finding negated "the possibility that [the plaintiff] is conclusively disabled at step three," making any omission in the ALJ's step three analysis harmless. *Id.*

Here, the ALJ found, in part, that Plaintiff "can lift 20 pounds occasionally and 10 pounds frequently, stand/walk/sit for 6 hours each in an 8 hour workday[,] . . . can frequently stoop, can never work on ladders, ropes, and scaffolds, . . . can frequently climb ramps and stairs, has unlimited ability to balance, [and] can occasionally kneel, crouch, and crawl." AR 20. As in *Duncan*, such analysis conclusively negates the possibility that Plaintiff was presumptively disabled at step three under 1.04A. *Duncan*, 608 F. App'x at 576. Accordingly, the Court finds that the ALJ's omission of Listing 1.04 in her step three analysis was harmless error.

Similar to the 12.03 analysis, the harmless nature of this error is confirmed by Plaintiff's failure to point to evidence in the record to support a finding that he meets the requirements of 1.04. *Id.* In *Aslan v. Colvin*, the plaintiff failed "to direct [the court's] attention to any medical records" confirming the elements of Listing 1.04. 637 F. App'x at 509. In failing to show that he could satisfy the criteria of that listing, the plaintiff could not prevail as a matter of law. *Id.* at 509–10. Similarly, in *Duncan*, the plaintiff "presented no medically acceptable test showing" Listing 1.04A, so he could not prevail as a matter of law. *Duncan*, 608 F. App'x at 576. While the Court considers the entire record, "[i]n the absence of essential references to the record in a party's brief, the court will not 'sift through' the record to find support for the claimant's arguments." *U.S. v. Rodriguez-Aguirre*, 108 F.3d 1228, 1237 n.8 (10th Cir. 1997).

**II.      ALJ did not Fail to Consider all of Plaintiff's Medically Determinable Impairments**

Plaintiff challenges whether the ALJ properly considered his non-severe, medically determinable impairments, namely his migraines and asthma.  Op. Brief at 7.  More generally, Plaintiff asserts that the ALJ did not "include each of [his] medically determinable mental impairments, whether found to be severe or nonsevere, as part of a step four residual functional capacity analysis."  *Id.* at 8 (citing 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2)).  This includes Plaintiff's hallucinations.

In the RFC analysis, the ALJ "must consider the combined effect of all of the claimant's medically determinable impairments, *whether severe or not severe*."  *Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013) (citing 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2)).  The ALJ cannot simply rely on a finding of non-severity in place of a proper RFC analysis.  *Id.*  In other words, the ALJ's "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence."  *Id.* (citation omitted).

Plaintiff contends that the ALJ's omission of consideration of Plaintiff's hallucinations is evident because the RFC lacked inclusion of proper accommodations, including "additional and unscheduled breaks for headaches or days of excessive paranoia; flexibility in work schedule due to chronic migraine days; limiting exposure to environmental irritants such as fumes and dust to avoid irritating his asthma; allowing for additional time off task[s] due to hallucinations or pain from headaches; increased absences for all of the above conditions and finally limitations regarding ability to interact with others due to sudden and unprovoked outbursts."  Op. Brief at 8.  Plaintiff notes that some accommodations like these were even posed as questions to the VE.  *Id.*  For example, the ALJ asked the VE, "If I added to my hypothetical this individual could be prone

to unexpected off task behavior regarding disagreements with coworkers or supervisors or hallucinations, this would occur approximately 25 percent of the workday, could also be a result of migraine headache taking them off task 25 percent, could they do any of these jobs?"  AR 59. The VE responded with: "No, ma'am."  *Id.*  Plaintiff argues that such limitations never appeared in the ALJ's RFC determination.  Op. Brief at 8.

While not every question or piece of evidence appeared in the ALJ's analysis, Plaintiff is incorrect to argue that the ALJ did not consider Plaintiff's hallucinations in her RFC analysis.  She noted that in a follow-up appointment in October 2016, Plaintiff reported improvements in his mood and anxiety, as well as denying any command voices and a reduction in hallucinations since being on medication.  AR 23.  Further, the ALJ discussed how Plaintiff reported not doing well after weaning himself off of his psychotropic medications (which he had stopped taking by January 2018).  AR 24.  Finally, she described that by March 2018, Plaintiff returned to using medication, and his hallucinations improved.  *Id.*  This discussion satisfies the Court that the ALJ considered the hallucinations (and mental impairments generally) in her RFC analysis.  *Cf. Berg v. Berryhill*, 2018 WL 276280, at *9 (D. Colo. Jan. 3, 2018) (remanding because the court could not conclude that the ALJ properly considered the plaintiff's migraines or PTSD "[w]ithout any discussion of [those impairments] in her RFC assessment").

Plaintiff also argues that the ALJ improperly relied solely on her step two analysis for Plaintiff's migraines and asthma.  The Court notes that the ALJ discussed Plaintiff's migraines throughout her RFC assessment.  AR 22, 24.  Hence, for the same reasons as described with the hallucinations, the ALJ did not err as a matter of law in failing to consider Plaintiff's migraines as part of the RFC analysis.

Unlike with migraines or hallucinations, the ALJ's step four analysis lacks any meaningful discussion of Plaintiff's asthma.  In her otherwise thorough review of the records, the ALJ only mentions asthma once in reference to Dr. Kramer diagnosing Plaintiff with a history of asthma. AR 25.  That sole mention hardly constitutes "a narrative discussion describing how the evidence supports" the RFC conclusions.  *Wells*, 727 F.3d at 1065.  However, an ALJ is not restricted to a proper RFC analysis at step four; that is, "[a]n ALJ could, of course, find at step two that a medically determinable impairment posed no restriction on the claimant's work activities . . . . Such a finding would obviate the need for further analysis at step four."  *Id.* at 1065 n.3.  The ALJ made such a finding in this case.  In discussing the non-severe impairments of migraines and asthma, the ALJ found that the "objective medical findings regarding these impairments failed to support a minimal duration of twelve months or a degree of limitation which significantly limits the claimant's mental or physical ability to perform work related activities."  AR 18–19.  The ALJ then described how his asthma was adequately treated with inhalers.  AR 19.  Because the ALJ found that asthma posed no restriction on Plaintiff's work activities at step two, the ALJ did not err in failing to discuss it at step four.[1]

III.    **The ALJ Properly Evaluated Plaintiff's Subjective Allegations**

Plaintiff's final challenge to the ALJ's decision is that she failed to provide "specific reasons for the finding on [Plaintiff's] credibility, supported by the evidence in the case record." Op. Brief at 10 (quoting *Sales v. Berryhill*, No. 16-2757-EFM, 2017 WL 6451103, at *13 (D. Kan. Dec. 18, 2017)).  Defendant responds that the ALJ "considered Plaintiff's subjective descriptions of his symptoms and concluded his statements concerning the intensity, persistence and limiting

---

[1] Though the ALJ explicitly considered Plaintiff's migraines as step four, the same is true for that impairment.

effects of these symptoms were not entirely consistent with the medical evidence." Resp. Brief at 11. Plaintiff emphasizes that the ALJ's alleged error does "not turn on whether substantial evidence supports the conclusion the ALJ made here but instead whether she followed the law to do so." Reply at 4–5.

In *Luna v. Bowen*, the Tenth Circuit recognized that "subjective" evidence of pain must be properly evaluated by the ALJ. 834 F.2d 161, 165–166 (10th Cir. 1987). Regulations also explicitly state that "subjective" evidence "will be taken into account." 20 C.F.R. § 404.1529(3). Several factors the ALJ should consider regarding subjective reports are listed in those regulations. *Id*. However, the Tenth Circuit "does not require a formalistic factor-by-factor recitation of the evidence . . . [s]o long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility." *Poppa v. Astrue*, 569 F.3d 1167, 1171 (10th Cir. 2009). Social Security Ruling (SSR) 16-3p provides that the ALJ, "[i]n considering the intensity, persistence, and limiting effects of an individual's symptoms," is to consider "the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record."

"The ALJ is charged with carefully considering all the relevant evidence and linking his findings to specific evidence." *Barnett v. Apfel*, 231 F.3d 687, 689 (10th Cir. 2000) (citing *Clifton*, 79 F.3d at 1009–10 (holding the "record must demonstrate that the ALJ considered all of the evidence," and the ALJ must "discuss[ ] the evidence supporting his decision, . . . the uncontroverted evidence he chooses not to rely upon, [and] significantly probative evidence he rejects")). "[F]indings as to credibility should be closely and affirmatively linked to substantial

evidence and not just a conclusion in the guise of findings." *Romero v. Colvin*, 563 F. App'x 618, 620 (10th Cir. 2014) (quoting *Wilson v. Astrue*, 602 F.3d 1136, 1144 (10th Cir. 2010)).

The ALJ began her RFC analysis by noting that she had "considered all symptoms" and "opinion evidence in accordance" with 20 CFR 404.1529, 416.929, 404.1527, and 416.927. AR 21. The ALJ then spent nearly six pages detailing Plaintiff's medical symptoms and history. AR 21–26. At the end, she wrote:

> In sum, the claimant alleged multiple physical and mental symptoms; however, Social Security Regulations provide that an individual's subjective complaints shall not alone be conclusive of evidence of disability. Instead, there must be medical signs and findings established by medically acceptable diagnostic techniques. These signs and findings must show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities that could reasonably be expected to produce the pain or other symptoms alleged and would lead to a conclusion that the claimant is under a disability. The medical evidence in this case revealed the claimant has the above-mentioned impairments, which cause some limitations. Thus, the undersigned reduced the residual functional capacity to accommodate limitations resulting from these conditions as described herein. However, the undersigned did not find the claimant's allegations that he is incapable of all work activity due to the alleged limitations to be consistent with the totality of the evidence of record in light of the reasons outline herein.

AR 26–27.

Plaintiff recognizes that the ALJ summarized Plaintiff's medical records and assessed weight for the medical opinions. Op. Brief at 11. Plaintiff argues, though, that the ALJ erred in not expressly stating her credibility determination of Plaintiff's testimony and providing no explanation as to why it seems she gave it no weight. *Id.* The Court does not agree. True, "the ALJ did not explicitly state 'I find this statement credible' or 'I find this statement not credible' for each factual assertion." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1169 (10th Cir. 2012). Yet, such a "formalistic factor-by-factor recitation of the evidence" is not required. *Poppa v. Astrue*, 569 F.3d 1167, 1171 (10th Cir. 2009). The ALJ has not erred so long as she "sets forth the specific evidence [s]he relies on in evaluating the claimant's credibility,". *Qualls v. Apfel*, 206 F.3d 1368,

1372 (10th Cir. 2000).  The ALJ has done so here.  The ALJ summarized Plaintiff's testimony and subjective beliefs, spent almost five pages describing the evidence in the record, noted inconsistencies when appropriate, and concluded that Plaintiff's allegations were not consistent with the totality of the evidence.

Although Plaintiff proffers that his argument is a legal one, the Court proceeds to examine whether there was substantial evidence to support the ALJ's conclusion since the question of credibility is inextricably linked to the substantial evidence question. *Romero v. Colvin*, 563 F. App'x 618, 620 (10th Cir. 2014) ("[F]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings.") (quoting *Wilson v. Astrue*, 602 F.3d 1136, 1144 (10th Cir. 2010)).  "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. . . . However, [a] decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it."  *Hamlin*, 365 F.3d at 1214 (citations omitted).  The ALJ is not required to "discuss every piece of evidence."  *Id.* at 1067 (citing *Frantz v. Astrue*, 509 F.3d 1299, 1303 (10th Cir. 2007)).

In March 2015, treatment provider notes state that Plaintiff had not attended a medication management appointment in eleven months (and no therapy appointment since November 2014). AR 293.  In August 2016, when Plaintiff was placed on a seventy-two-hour mental health hold, he reported that he had not been taking his medication for seven months prior to the incident.  AR 284, 295.  Plaintiff indicated improved conditions once beginning therapy and restarting his medication.  AR 321, 689–90, 694.  Plaintiff attempted to try doing therapy on an as-needed basis, AR 747, but was advised to return to a regular therapy schedule, AR 758, 760–61, 763–65, 767. These are some examples showing that treatment (both medication and therapy) aided Plaintiff's

mental health while the instances when he reported increased symptoms corresponded to times when Plaintiff did not take his medication or attend therapy.  AR 295, 321, 689–90, 694, 755, 758, 760–61, 763–65, 767.  This supports the ALJ's conclusion.  *See White v. Barnhart*, 287 F.3d 903, 909–10 (10th Cir. 2002) (finding that the plaintiff's "admission that medication relieved some of her pain" as support for the ALJ's conclusion that the plaintiff "was capable of performing more extensive work than she acknowledged"); *Megginson v. Astrue*, 489 F. App'x 260, 263 (10th Cir. 2012) (finding objective evidence supported ALJ's discounting of the claimant's allegations). Therefore, looking at the evidence in the record, the Court finds that the ALJ's findings as to Plaintiff's credibility are closely and affirmatively linked to substantial evidence.  *Romero*, 563 F. App'x at 620.

## CONCLUSION

In sum, the Court concludes that the ALJ properly considered all relevant evidence in the record, her decision was supported by substantial evidence, and she committed no legal error. Accordingly, the decision of the ALJ that Plaintiff was not disabled (as defined by the SSA) since March 31, 2015 is AFFIRMED.

SO ORDERED.

Dated this 9th day of February, 2021, at Denver, Colorado.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge